22cv5080
Judge Durkin
Judge Valdez
PC 14
RANDOM



FILED
SEP 19 2022 SMB
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District NORTHERN DISTRICT OF ILLINOIS | |
|---|---|---|
| Name Cordell L. Irons | Prisoner No. R18952 | Case No. |
| Place of Confinement | Robinson Correctional Center<br>13423 East 1150th Avenue<br>Robinson, Illinois 62454 | |
| Name of Petitioner (include name under which convicted)<br>CORDELL L. IRONS | V. | Name of Respondent (authorized person having custody of petitioner)<br>RACHEL DODD |
| The Attorney General of the State of: Illinois | | |

## PETITION

1. Name and location of court which entered the judgment of conviction under attack <u>13th Judicial Circuit, Circuit Court of LaSalle County, Illinois, No. 18-CF-502, Hon. H. Ryan.</u>

2. Date of judgment of conviction <u>March 13, 2019</u>

3. Length of sentence <u>22 years and 10 years (concurrent) plus 3 years MSR (Parole)</u>

4. Nature of offense involved (all counts) _____

   <u>Unlawful Possession of a Controlled Substance w/ Intent to Deliver</u>

   <u>Unlawful Possession of a Weapon by a Felon</u>

5. What was your plea? (Check one)
   (a) Not guilty ☒
   (b) Guilty ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:
   N/A

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☒
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☒ No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☒ No ☐

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

   (a) Name of court __Appellate Court of Illinois, Third District__

   (b) Result __Judgement Affirmed, with one Justice dissenting in part.__

   (c) Date of result and citation, if known __October 4, 2021 - 2021 IL App(3d) 190372-U__

   (d) Grounds raised __Circuit Court erred in not suppressing defendant's statements after he had invoked his right to counsel and police conducted further interrogation.__

   (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

   (1) Name of court __Illinois Supreme Court__

   (2) Result __Petition For Leave to Appeal Denied__

   (3) Date of result and citation, if known __January 26, 2022 - No. 127832__

   (4) Grounds raised __That it was not harmless error, as Appellate Court found, for the Circuit Court to not suppress defendant's illegally obtained statements.__

   (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

   (1) Name of court __United States Supreme Court__

   (2) Result __Petition For Writ of Certiorari; returned for being untimely.__

   (3) Date of result and citation, if known __June 16, 2022 - No citation/petition returned__

   (4) Grounds raised __Whether it is harmless error for a defendant's illegally obtained statements to be used as primary evidence against him at trial.__

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
    Yes ☐ No ☒

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court __N/A__

    (2) Nature of proceeding __N/A__

    (3) Grounds raised __N/A__

AO 241 (Rev. 5/85)

    (4) Did you receive an evidentiary hearing on your petition, application or motion?
        Yes ☐  No ☐  N/A

    (5) Result __N/A__

    (6) Date of result __N/A__

(b) As to any second petition, application or motion give the same information:

    (1) Name of court __N/A__

    (2) Nature of proceeding __N/A__

    (3) Grounds raised __N/A__

    (4) Did you receive an evidentiary hearing on your petition, application or motion?
        Yes ☐  No ☐  N/A

    (5) Result __N/A__

    (6) Date of result __N/A__

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
    (1) First petition, etc.    Yes ☐  No ☐  N/A
    (2) Second petition, etc.  Yes ☐  No ☐  N/A

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:
    N/A

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
    CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may

A. Ground one: Petitioner's conviction was based in large part on statements obtained by police after he had asserted his right to counsel.

Supporting FACTS (state briefly without citing cases or law): The Petitioner unequivocally invoked his right to counsel in response to police questioning him about a firearm and drugs found in a safe located at a residence not belonging to him. Police reapproached him and made threats, after which he made statements incriminating himself as owner of the firearm and drugs. A suppression hearing was conducted, after which the trial court allowed the Petitioner's statements to be used as evidence against him at trial. Absent those statements, Petitioner's trial was merely a "credibility contest" between one state witness and himself. Petitioner asserts that the trial court erred in not suppressing those statements, as they were illegally obtained after Petitioner had requested counsel. The four and a half hour interrogation was videotaped.

B. Ground two: The Appellate Court erroneously held that, while they were unanimous that trial court erred in not suppressing, this was harmless error.

Supporting FACTS (state briefly without citing cases or law): On appeal the Appellate Court held that trial court erred in not suppressing the Petitioner's statements, but two of the three Justices found this to be harmless error. The dissenting Justice held, as does the Plaintiff here, that allowing illegally obtained statements to be used as evidence in a trial that is little more than a credibility contest between two people can never be harmless error.

AO 241 (Rev. 5/85)

C. Ground three: Beyond being a plain error, the admission of Petitioner's illegally obtained statements had a substantial and injurious effect on the proceedings.

Supporting FACTS (state *briefly* without citing cases or law): The firearm and drugs were found in a safe inside a residence where the Petitioner did not reside. Absent his statements, the only evidence connecting him to the gun and drugs was the testimony of one witness; the person in whose home those items (a gun and drugs) were found. The admission of Petitioner's statements, which the Appellate Court unanimously found were illegally obtained and should have been suppressed, undoubtedly tipped the scales far in favor of the prosecution.

D. Ground four The Appellate Court usurped the role of the jury as factfinder when it arbitrarily assumed that the jury would have found Petitioner guilty anyway.

Supporting FACTS (state *briefly* without citing cases or law): The Appellate Court found that while Petitioner's statements should have been suppressed by the trial court, it erroneously held this to be harmless error. In so doing, they made a leap of faith in assuming a jury would find Petitioner's testimony to not be credible when no other testimony, physical or forensic evidence linked the Petitioner to the items found in a safe not belonging to him other than his own statements and the testimony of the person who did own the safe.

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: _____
N/A

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐  No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing  N/A

(b) At arraignment and plea  Ryan Hamer, 400 West Norris Drive, Ottawa, Illinois 61350

AO 241 (Rev. 5/85)

(c) At trial  Ryan Hamer, 400 West Norris Drive, Ottawa, Illinois 61350

(d) At sentencing  Ryan Hamer, 400 West Norris Drive, Ottawa, Illinois 61350

(e) On appeal  James Wozniak, Office of the State Appellate Defendar, Third Judicial District, 770 E.Etna Road, Ottawa, Illinois  61350

(f) In any post-conviction proceeding  N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding  N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐  No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐  No ☒
   (a) If so, give name and location of court which imposed sentence to be served in the future: _____
   N/A

   (b) Give date and length of the above sentence: N/A

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
   Yes ☐  No ☐ N/A

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____N/A_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on August      , 2022.

_8/16/22_
(date)

_Cordell Dixon_ (signature)
Signature of Petitioner

ATTACHMENT A

People v. Irons, Appeal No. 3-19-0372

October 4, 2021, Appellate Court of Illinois, Third District

2021 IL App (3d) 190372-U; 2021 Ill.App. Unpub. LEXIS 1755

ATTACHMENT B

People of the State of Illinois v. Cordell L. Irons, No. 127832

January 26, 2022, Order of the Supreme Court of Illinois

Ⓐ Neutral
As of: May 25, 2022 3:33 PM Z

## *People v. Irons*

Appellate Court of Illinois, Third District

October 4, 2021, Order Filed

Appeal No. 3-19-0372

**Reporter**
2021 IL App (3d) 190372-U *; 2021 Ill. App. Unpub. LEXIS 1755 **

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. **CORDELL L. IRONS**, Defendant-Appellant.

**Notice:** THIS ORDER WAS FILED UNDER *SUPREME COURT RULE 23* AND MAY NOT BE CITED AS PRECEDENT BY ANY PARTY EXCEPT IN THE LIMITED CIRCUMSTANCES ALLOWED UNDER *RULE 23(e)(1)*.

**Subsequent History:** Appeal denied by *People v. Irons, 2022 Ill. LEXIS 145 (Ill., Jan. 26, 2022)*

**Prior History:** [**1] Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, Circuit No. 18-CF-502. Honorable Howard C. Ryan Jr., Judge, Presiding.

**Disposition:** Affirmed.

## Core Terms

safe, gun, cocaine, interview, credibility, suppress, questions, daughter, recording, bedroom, harmless, law enforcement, holding cell, photograph, incriminating statement, controlled substance, right to counsel, belongings, arrived, locked, unlawful possession, defense motion, driveway, improperly admitted, domestic battery, corroborated, custody, deliver, motion to suppress, jury's function

**Judges:** JUSTICE WRIGHT delivered the judgment of the court. Justice Lytton concurred in the judgment. Justice Schmidt concurred in part and dissented in part.

**Opinion by:** WRIGHT

## Opinion

**ORDER**

[*P1] *Held*: The circuit court improperly denied defendant's pretrial motion to suppress his incriminating statements obtained by law enforcement during a custodial interrogation. In light of the strength of the State's evidence, excluding defendant's incriminating statements, the judicial error was harmless.

[*P2] Defendant, **Cordell L. Irons**, appeals his convictions for unlawful possession of a controlled substance with intent to deliver and unlawful possession of a weapon by a felon (UPWF). The circuit court erred by denying defendant's motion to suppress. However, the improper denial of defendant's motion to suppress constituted harmless error due to the strength of the State's evidence, exclusive of defendant's statements.

[*P3] I. BACKGROUND

[*P4] The State charged defendant with unlawful possession of a controlled substance with intent to deliver (*720 ILCS 570/401(a)(2)(A)* (West 2018)) and UPWF (*720 ILCS 5/24-1(a)* (West 2018)). [**2] The State's evidence, introduced during a suppression hearing and at trial, including portions of video and audio recordings of defendant's approximately 4 1/2 hour interview with law enforcement officers, established the uncontested events summarized below.

[*P5] On January 8, 2018, Samantha Lafferty, the mother of two of defendant's children, arrived at the La Salle Police Department, apparently without prior notice. Upon her arrival, Lafferty reported that defendant committed a domestic battery against Lafferty and her daughter on the day before. Lafferty also reported her concerns about a gun in her home that belonged to defendant, a convicted felon. While at the police station, Lafferty executed a written consent form allowing law enforcement to search her residence and seize the gun. After signing the written consent form, Lafferty accompanied the officers to her residence.

APPENDIX A

Document Delivery Case: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 9 of 19 PageID #:9 Page 2 of 9 Page 3 of

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **2

[*P6] When the officers and Lafferty arrived at her residence, defendant was observed to be seated in a vehicle, a 2010 Lincoln, that was parked in the driveway. Officers arrested defendant for domestic battery. La Salle Police Lieutenant Michael Smudzinski transported defendant to the La Salle police station, where officers [**3] later spoke with defendant.

[*P7] After entering her residence, Lafferty opened her bedroom safe for the officers with her key. Once Lafferty opened the safe, officers not only discovered a gun, but also unexpectedly discovered approximately 31 grams of a substance containing cocaine, with a street value of approximately $3100. The officers processed the evidence removed from the safe and photographed the scene.

[*P8] Thereafter, defendant was interviewed by law enforcement about both the domestic battery and the items seized from Lafferty's safe. The entire interview was recorded. The recording shows that the following persons were present, at times, during defendant's interview: Officer Nicholas Martin, a member of the La Salle Police Department, La Salle Police Detective Curt Martin, La Salle Police Officer/Tri-Dent Drug Task Force Agent Brian Zebron, and Lieutenant Michael Smudzinski, who was also a member of the La Salle Police Department.

[*P9] Initially, Officer Martin spoke with defendant about an alleged incident of domestic violence that took place at Lafferty's residence the day before. Officer Martin read defendant the *Miranda* warnings. Officer Martin concluded his portion of the interview [**4] with defendant after 20 to 25 minutes but remained present in the interview room when Agent Zebron took over the interview and began questioning defendant about the gun and cocaine discovered in Lafferty's bedroom safe on January 8, 2018.

[*P10] After speaking with Agent Zebron for approximately 10 minutes, defendant verbalized, among other things, that defendant's lawyer was not present. Based on defendant's use of the word "lawyer," Agent Zebron stopped conversing with defendant and left the area. According to Agent Zebron, he went "upstairs." After defendant's same reference to a "lawyer," Detective Martin told defendant that it was "fine" that defendant wanted an attorney.

[*P11] Shortly thereafter, Lieutenant Smudzinski escorted defendant to a holding cell. Lieutenant Smudzinski was not present earlier while Agent Zebron questioned defendant. However, Lieutenant Smudzinski passed through the area, where the interview was taking place, when checking for rubber gloves.

[*P12] After he placed defendant in the holding cell, Lieutenant Smudzinski spoke with defendant. This recorded conversation lasted for slightly less than three minutes. According to Lieutenant Smudzinski, after this short conversation, [**5] he "let" defendant "out" of the holding cell. Detective Martin was present in the area when defendant stepped out of the holding cell. According to Lieutenant Smudzinski, Agent Zebron returned to that area near the holding cell. When defendant spotted Agent Zebron, after the agent "came back down" to the area near the holding cell, defendant stated, "What's up Zebron?" Agent Zebron replied "I don't know what's up. But, here's the deal, you wanted a lawyer." Defendant responded "Nah, I never asked for no lawyer. I said my lawyer's not present to be asking no questions like that. I'm not going to ask no questions." Thereafter, Agent Zebron resumed questioning defendant about the confiscated gun and cocaine discovered in Lafferty's locked safe.

[*P13] Over the course of the next few hours, defendant made incriminating statements to Agent Zebron. Defendant's statements were related to his cocaine sales and explained how he obtained the gun that was seized by law enforcement. Defendant was charged with unlawful possession of a controlled substance with intent to deliver and UPWF on December 4, 2018.

[*P14] A. Motion to Suppress Hearing

[*P15] Defendant filed a pretrial motion to suppress his incriminating statements [**6] on various grounds. Of significance to this appeal, defendant's motion to suppress alleged defendant invoked his fifth amendment right to counsel by verbalizing his desire to end the conversation with Agent Zebron because his lawyer was not present. The State opposed the motion to suppress on the grounds that the recording of the interview process revealed defendant had neither clearly verbalized nor unequivocally asserted his right to counsel before Agent Zebron returned and resumed questioning after defendant told Agent Zebron, "Nah. I never asked for no lawyer."

[*P16] During the hearing on the motion to suppress, Agent Zebron stated that he interpreted defendant's vernacular word choices as defendant's request to speak with his lawyer. Agent Zebron explained "that's why I stopped asking any questions."

ocument DeliveryCase: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 10 of 19 PageID #:10 Page 4 of

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **6

[*P17] Noting that it was difficult for the agent to completely understand every word spoken by defendant, Agent Zebron informed the court that he listened to the recording of his portion of the interview approximately 20 times before testifying before the court that day. Yet, after listening to the recording many times, Agent Zebron admitted that he was less certain about the precise words defendant used with [**7] reference to a lawyer. Agent Zebron told the court that "initially I thought it was he's not asking any questions, but now looking back at it numerous times, it does sound like it's potentially answering."

[*P18] During the hearing on the motion to suppress, the State introduced the relevant portions of the video and audio recordings of the interview for the court's consideration. The recording includes the following statements by defendant, "I'm not [answering or asking]¹ no questions, my lawyer ain't here. Why would I answer questions? I'm not asking questions. I'm not here to ask the questions. I'm just here to tell you what's not mine."

[*P19] The recording shows that following these statements by defendant, Detective Curt Martin told defendant it was fine if he wanted a lawyer. Defendant continued speaking, by saying "It's not mine man. Now how you supposed to help me out? How am I getting helped?" Agent Zebron responded by telling defendant that defendant could help himself by cooperating.

[*P20] Detective Martin also testified before the court during the hearing on defendant's motion to suppress. Detective Martin indicated to the court that he interpreted defendant's word choice as a refusal to "answer" [**8] questions. When asked directly if Detective Martin agreed that defendant said, "I'm not answering no questions. My lawyer ain't here," Detective Martin testified that he agreed with this characterization.

[*P21] The court also received the testimony of Lieutenant Smudzinski. As included in the background set forth above, the lieutenant explained that he escorted defendant to the holding cell where he spoke to defendant, alone, for approximately three minutes. He explained he had a past history with defendant and wanted to convince defendant to resume speaking to the investigators. He also indicated that when he "let [defendant] out" of the holding cell, Detective Martin was still present but Agent Zebron "came back down" later.

[*P22] At the conclusion of the hearing on defendant's motion to suppress, the court stated "After watching the tape, I agree. He probably didn't do it good enough." Based on this finding, the court ruled in favor of the prosecution on the issue of whether defendant clearly and unequivocally asserted his fifth amendment right to counsel. The court denied the motion to suppress. The matter proceeded to a jury trial.

[*P23] B. Trial

[*P24] The State presented the testimony of the following witnesses: Samantha [**9] Lafferty, Officer Nicholas Martin, Detective Curt Martin, Lieutenant Michael Smudzinski, Agent Brian Zebron, James Coglianese, Sabrina Halley, and Pamela Wilson. Defendant also testified on his own behalf.

[*P25] Samantha Lafferty testified that she was 38 years old and was the mother of two of defendant's daughters, ages 18 and 9. Lafferty testified that she had known defendant for 20 years. On January 4, 2018, she resided in the same residence, her grandmother's residence, with Lafferty's two daughters. Defendant did not reside at that location at any point in time. However, the door to the residence could not be locked and defendant frequently entered Lafferty's residence, after knocking before entry, for the purpose of visiting with his children.

[*P26] According to Lafferty, on January 4, 2018, defendant brought his clothes, shoes, and coats into Lafferty's residence, which was unusual. Defendant left those belongings, in piles, inside her residence and told her he was leaving them there for a few days until he could "figure out" what to do with them. Although he left his belongings on January 4, 2018, defendant did not spend the night between January 4 and January 8, 2018. A photograph marked [**10] as the State's exhibit No. 2 was introduced into evidence and depicted defendant's clothing located in the corner of Lafferty's bedroom, partially on top of what appears to be a storage container and partially on the floor.

[*P27] According to Lafferty's trial testimony, in

---

¹ On appeal, the parties dispute the exact words defendant used during the first segment of defendant's recorded interview. Defendant asserts that the recording is clear that he said he was not answering any questions. The State asserts that the recording was unclear as to whether he said "answering" or "asking." Because of this dispute and because the recording is not entirely clear, the alternative interpretations are included in the bracketed portions of defendant's statement.

Case: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 11 of 19 PageID #:11

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **10

addition to defendant's clothing, defendant also brought a gun into Lafferty's residence on January 4, 2018, and instructed her to "put it up." Consequently, Lafferty removed her personal belongings from a small safe she purchased from Walmart for $20. She then placed the gun inside the now empty safe, before locking the safe with one of two keys in her possession. She gave defendant a key to the safe. According to Lafferty, a few days later, the night before January 8, 2018, defendant committed an act of domestic violence against Lafferty and her teenaged daughter. Defendant's violent reaction was triggered by her daughter reaching for a napkin, while seated at the table eating a meal with her parents. Defendant felt his daughter was using poor manners and scolded her. When the teenager abruptly left the table, defendant felt she was being disrespectful, stood up, and grabbed his daughter "by her throat and put her up [**11] in the air." Lafferty testified that when she intervened to protect her daughter, defendant "slapped the hell out of me and continued to hit her for a little bit and then he stopped." According to Lafferty, defendant was eventually convicted for this domestic battery against his daughter and Lafferty.

[*P28] After this incident on January 7, 2018, Lafferty became concerned about defendant's ability to access his gun located in her home. The next day, January 8, 2018, she went to the La Salle Police Department and reported that there was a gun locked in her bedroom safe. Lafferty signed a written consent form permitting law enforcement to search her residence, and then accompanied the officers to her residence for that purpose. Lafferty escorted the officers to her bedroom and used a key to open the safe for the officer's inspection. According to Lafferty, the items locked in the safe, at that time, did not belong to Lafferty and had been brought into her residence by defendant.

[*P29] During cross-examination by defense counsel, Lafferty identified a letter, presented to her by defense counsel as Defendant's exhibit No. 1, as a letter she wrote on April 4, 2018, at defendant's request. Lafferty [**12] testified that the couple had "quite a few" domestic battery issues over the years. Due to this history, Lafferty testified that when defendant told her to do something she found it wise to comply "[b]ecause [she would] either be verbally or physically abused if [she didn't]." For example, Lafferty explained that defendant drove a 2010 Lincoln. Defendant always had possession of the vehicle and she did not have a key or access to use the 2010 Lincoln. Nonetheless, when defendant asked her to place the title to that 2010 Lincoln in her name, she did so.

[*P30] In the letter, Lafferty declared that the statement she gave to police on January 8, 2018, regarding defendant was inaccurate. The letter continued:

"I stated that he gave me a gun to hold for him. That statement was not true. I was seeing a guy and he left it over at my house. We decided not to talk anymore and he never came back for the gun. So I kept it locked in my safe. As far as the drugs found in the safe, those were found outside behind my garage. I put the bags I found in my safe. I was angry with [defendant] for the fight him and my daughter had so I told the police it was his to get him in more trouble. The gun and drugs were [**13] not [defendant's]."

[*P31] Lafferty explained the circumstances leading to her preparation of the letter on April 4, 2018. On that date, defendant surprised Lafferty when he arrived at her residence. She stated she was "shocked" to see defendant because he was on parole when he battered his daughter on January 7, 2018, and Lafferty expected he would remain in custody for that reason. After arriving at her residence without warning, defendant instructed Lafferty to write the letter because "[h]e wanted some insurance." Defendant told her what to write down and she wrote it down before signing the letter.

[*P32] Lafferty testified that contrary to the contents of her letter, she neither found nor placed drugs in her safe, and she never possessed the gun at issue. The April 4, 2018, letter mentioned another boyfriend. Lafferty explained that this statement in her letter was not true because she had not had another relationship since 2008. She added that she avoided developing personal relationships because this would cause a conflict between defendant and anyone she might date. Lafferty was in a relationship in 2008, but when defendant was released from prison, "there were threats made about, you know, [**14] having a guy around his kids and all that." Lafferty ended the 2008 relationship because she wanted to avoid any problems with defendant.

[*P33] Lafferty wrote the letter in April 2018, "because I felt like if I didn't I didn't know what would happen." She added, "I've had a bad history with him physical violence wise, and I didn't know what he would do" if she did not comply with his request.

[*P34] Lafferty was employed and had always worked to support herself. Defendant never provided her with child support. In the 20 years Lafferty had known

ocument DeliveryCase: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 12 of 19 PageID #:12 Page 6 of

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **14

defendant, she only knew of defendant having one job, which he had for approximately two months in the summer of 2018. Lafferty admitted that she did not "keep tabs" on whether defendant was employed.

[*P35] The State's next witness was Officer Nicholas Martin, from the La Salle Police Department. Officer Martin testified that he met with Lafferty at the police station on January 8, 2018, because she wanted to discuss some domestic issues she was having at home. Officer Martin testified that he observed Lafferty had visible physical injuries on that date.

[*P36] While discussing her family issues, Lafferty told Officer Martin that she was worried about a gun she had been [**15] "given" and wanted the officer to come to her home for that reason. Officer Martin described the process of obtaining Lafferty's consent to search her residence. He also testified about accompanying Lafferty back to the residence that day to retrieve the weapon from her safe.

[*P37] Upon their arrival at Lafferty's residence, Officer Martin immediately realized that defendant was present at Lafferty's residence, seated in a 2010 Lincoln that was parked in the driveway. Consequently, Officer Martin took defendant into custody at that time. Lieutenant Smudzinski transported defendant to the jail while Officer Martin searched the residence. Lafferty led Officer Martin to her bedroom and showed him her safe. The safe was locked and Lafferty opened it with a key.

[*P38] The State's next witness was Detective Curt Martin, who was also employed by the La Salle Police Department. According to Detective Martin, he accompanied several persons, including Officer Martin, Lafferty, and other law enforcement personnel, to Lafferty's residence on January 8, 2018, for the purpose of searching Lafferty's home with her consent. Detective Martin identified the .380-caliber handgun that he removed from Lafferty's safe [**16] and secured as evidence. He explained the .380-caliber handgun had a full clip but did not have any rounds in the chamber. Detective Martin further testified that the gun's serial number had been scratched off.

[*P39] During his testimony, Detective Martin described the process of seizing the evidence from Lafferty's safe and documenting the conditions in her bedroom by photographing the scene. Detective Martin testified that Lafferty pointed out baggies and scissors in a dresser drawer in her bedroom and he identified a photograph of those items. Detective Martin identified several photographs and other exhibits, including the cocaine, marked as State's exhibit No. 7, and a digital scale which was also found in the safe, that he took into evidence. Some of the items, such as the cocaine, was submitted to the crime laboratory for testing. Detective Martin testified to the chain of custody for those exhibits that were present in the courtroom.

[*P40] The State's next witness was Lieutenant Michael Smudzinski of the La Salle Police Department. Lieutenant Smudzinski testified that on January 8, 2018, he was a member of the law enforcement group that searched Lafferty's residence with her permission. [**17] According to Lieutenant Smudzinski, he was given the task of transporting defendant away from Lafferty's residence and to the police station. At the police station, Lieutenant Smudzinski inventoried the property defendant had on him. At that time, he found defendant to have approximately $1900 in cash. Defendant also had a set of keys, containing a car key and two other keys. Lieutenant Smudzinski identified various exhibits including, State's exhibit No. 9, which was a photograph of those keys. Lieutenant Smudzinski testified that at some point in time, he tried one of the keys in Lafferty's safe and the safe opened.

[*P41] The State's next witness was Agent Brian Zebron. Agent Zebron was a police officer with the La Salle Police Department but had been assigned to the Tri-Dent Drug Task Force. Agent Zebron was qualified as an expert in the field of narcotics investigations. Agent Zebron testified as to an interview he conducted with defendant on January 8, 2018. He identified a portion of the recording of that interview which was introduced into evidence as the State's exhibit No. 11. Agent Zebron testified about defendant's incriminating statements, made during the interview that day. [**18] These statements included admissions regarding defendant's sales of cocaine and defendant's possession of the gun found in Lafferty's safe.

[*P42] Agent Zebron further testified that in La Salle County, the 31.6 grams of cocaine found in Lafferty's safe could potentially sell for approximately $3100. Agent Zebron opined the cocaine was for distribution based upon various factors including, the form of the cocaine, other items found with or near the cocaine including the baggies, scissors, gun "with the obliterated serial numbers," and digital scale, and the fact defendant was found with $1900 in cash.

[*P43] The State next called James Coglianese, who was employed with the Illinois State Police command at the Joliet forensic science laboratory. Coglianese is a

Document Delivery Case: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 13 of 19 PageID #:13 Page 7 of Page 6 of 9

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **18

forensic scientist in the area of drug chemistry. Coglianese testified as to the procedure at the Illinois State Police laboratory for in-taking evidence. He testified as to his in-taking of evidence—People's exhibit No. 7—received from Detective Curt Martin and chain of custody with respect to that evidence.

[*P44] The State next called Sabrina Halley, who was employed as an evidence technician with the Illinois State Police in the Joliet forensic [**19] science laboratory. Halley testified that she retrieved People's exhibit No. 7 from the evidence vault and returned it to Detective Curt Martin.

[*P45] The State next called Pamela Wilson, who is a forensic scientist in drug chemistry with the Illinois State Police Joliet forensic science laboratory. Wilson testified as an expert in the analysis of controlled substances. Wilson testified as to the chain of custody as to People's exhibit No. 7. She further testified as to her testing of that evidence. Wilson testified that her analysis revealed that People's exhibit No. 7 was 31.6 grams of cocaine. She stated her opinion as to the weight and nature of the substance to a reasonable degree of scientific certainty.

[*P46] Additionally, the State introduced the State's exhibit No. 12. This exhibit was a certified copy of defendant's prior felony conviction for unlawful delivery of a controlled substance, cocaine. After the State rested their case, defendant testified in his own defense.

[*P47] Defendant testified that he had been to Lafferty's residence multiple times but that he did not live there. Defendant was not aware that the front door did not lock. The front door had a dresser in front of it, and it [**20] was essentially barricaded. Defendant did not have a key to Lafferty's residence. Defendant admitted that on January 8, 2018, defendant was present at Lafferty's residence when the police arrived, because he was hoping to talk to his daughter about the domestic incident that occurred the previous night. Defendant testified that he pled guilty to the domestic battery charge that resulted from the incident.

[*P48] Defendant agreed that he was seated in the 2010 Lincoln that he parked in the driveway of Lafferty's residence. According to defendant, Lafferty owned the 2010 Lincoln and allowed defendant to use that vehicle. Defendant testified that Lafferty gave defendant the keys to the Lincoln. Later in 2018, the 2010 Lincoln was registered to Morina Johnson, who defendant described as a "mutual friend." Despite the change in registration, defendant continued to drive the Lincoln.

[*P49] During his testimony, defendant was asked about a photograph of a key fob and two keys depicted in State's exhibit No. 9. Defendant identified the smaller key as a key on the key ring when Lafferty gave it to him. Defendant never used that smaller key, but he assumed it went to Lafferty's safe. Defendant did not know [**21] what the larger key would open. Defendant identified the key fob in the photograph as the key to the Lincoln.

[*P50] Defendant stated that he was employed in January 2018 and had been for about 15 months. Defendant worked with a friend obtaining old pallets and reselling them in the Oswego/Aurora area. Defendant's friend's name was Omar, but defendant could not remember Omar's last name. Defendant was paid in cash $75 per trip.

[*P51] According to defendant's testimony, defendant agreed the police found defendant while he was parked in Lafferty's driveway. When the officers searched defendant, defendant had a key to Lafferty's safe in his pocket. Defendant also had approximately $1900 in cash in his pocket. Defendant obtained the money by working for his friend. Defendant felt it was safest to carry the money on him because defendant lived with his uncle. At the time, defendant was looking for an apartment and had been saving his money.

[*P52] During his trial testimony, defendant explained that he initially denied any knowledge of the gun or cocaine in Lafferty's safe. However, defendant was scared and thought if he told investigators what they wanted to hear, that they would work with him. Defendant [**22] eventually told investigators he had been in the safe numerous times and that he bought the gun. Defendant testified that he never went in the safe. The gun and cocaine were not his, and he did not know who they belonged to. Defendant also denied placing baggies or scissors in a dresser drawer in Lafferty's bedroom.

[*P53] Regarding Lafferty's April 4, 2018, letter, defendant acknowledged he was present when Lafferty wrote the letter, but defendant denied forcing Lafferty to do so. Defendant did not make any threats to Lafferty to induce her to write the letter. Lafferty "felt bad about everything" and indicated she gave the police her initial statement because she wanted defendant to "do more time."

[*P54] The State's closing argument heavily relied on the interview with police that defendant had sought to suppress. The jury found defendant guilty of both

Case: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 14 of 19 PageID #:14

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **22

charges. Defendant filed a motion for new trial, again asserting the incriminating statements should be suppressed. The court denied the motion. Defendant was sentenced to 22 years' imprisonment for unlawful possession of a controlled substance with intent to deliver and a concurrent term of 10 years' imprisonment for UPWF. Defendant appeals.

[*P55] [**23] II. ANALYSIS

[*P56] On appeal, defendant argues that the circuit court erroneously found that defendant's observation that his attorney was not present did not qualify as an unambiguous assertion of his right to counsel. The State argues that the trial court's finding was correct because defendant's word choice was vague and ambiguous. Alternatively, the State contends that if this court concludes the trial court should have granted defendant's motion to suppress, the court's error was harmless. In other words, the State submits that a new trial, minus defendant's incriminating statements, would have ended with the same guilty verdicts for the offenses of unlawful possession of a controlled substance with intent to deliver and unlawful possession of a weapon by a felon.

[*P57] We review a circuit court's ruling on a motion to suppress based on a two-part standard of review. *People v. Smith, 2016 IL 119659, ¶ 43, 412 Ill. Dec. 793, 76 N.E.3d 1251*. First, we determine whether the court's factual findings were against the manifest weight of the evidence. *Id.* With respect to questions of law, we review those issues *de novo*, before determining whether the motion to suppress should have been granted in the case at bar. *Id.*

[*P58] Turning to the questions of law that are relevant [**24] to this appeal, it is well established that if the suspect invokes his right to counsel in response to the *Miranda* warnings, the police must stop the interrogation and "may not reapproach the suspect for further interrogation until counsel has been made available to the suspect." *People v. Brickhouse, 2018 IL App (3d) 150807, ¶ 41, 425 Ill. Dec. 693, 115 N.E.3d 248*. The case law provides that the purpose of this precedent is "to prevent the police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Id. ¶ 42*. At a minimum, to unambiguously invoke the right to counsel, "a defendant must articulate his desire for an attorney to the police in a clear enough manner—free from indecision or double meaning—that a reasonable officer under the circumstances would understand the statement to be a request for an attorney." *Id.*

[*P59] Here, there were at least two officers present when Agent Zebron took over the interview process just before defendant verbalized his reluctance to either ask and/or answer Agent Zebron's questions because defendant's lawyer was not present at that time. While the precise words used by defendant are difficult to discern on the recording of that interview, the consistent responses by the officers are not in dispute. Namely, Detective Martin [**25] and Agent Zebron stopped the interview. Agent Zebron not only stopped speaking to defendant, Agent Zebron left the room. Detective Martin assured defendant that defendant's desire to have an attorney present was "fine." Since both officers interpreted defendant's word choice in the same way, we conclude that defendant's word choice was not ambiguous. Both law enforcement officers responded appropriately by ending the interview once defendant asserted his right to counsel. We note that neither Agent Zebron nor Detective Martin reapproached defendant. Instead, Lieutenant Smudzinski, who was not present at the time defendant made reference to a lawyer, violated the strict rule prohibiting any officer from reapproaching defendant. Therefore, the trial court should have granted defendant's motion to suppress all statements after Lieutenant Smudzinski reapproached defendant in the holding cell.

[*P60] The end result is that defendant's subsequent clarification or expressed change of heart about requesting the presence of his lawyer occurred before defendant had an opportunity to speak with counsel. Therefore, defendant's statement explaining that he did not wish to end the interview is equally [**26] inadmissible and has not been considered by this court.

[*P61] Nonetheless, this conclusion does not end the analysis. As the State points out, "[t]he admission into evidence of an improper confession is subject to harmless error analysis." *People v. Burnfield, 295 Ill. App. 3d 256, 263, 692 N.E.2d 412, 229 Ill. Dec. 639 (1998)*. "An error is considered harmless where the reviewing court can conclude that absent the error the outcome of the trial would not have been different." *Id.* In other words, "[i]f the evidence is so overwhelming that no rational jury—or juror—would have acquitted defendant" the error did not prejudice defendant. *People v. Rivera, 227 Ill. 2d 1, 22, 879 N.E.2d 876, 316 Ill. Dec. 488 (2007), aff'd sub nom. Rivera v. Illinois, 556 U.S. 148, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009)*.

Case: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 15 of 19 PageID #:15

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **26

[*P62] The State bears the burden of persuasion regarding whether an error, present in the record, constitutes harmless error. *People v. Johnson, 218 Ill. 2d 125, 142, 842 N.E.2d 714, 299 Ill. Dec. 677 (2005)*. If an error does not undermine our confidence in the jury verdict, then the error is harmless. *Id.* For the reasons set forth below, we remain confident in the guilty verdicts and conclude the court's error was harmless.

[*P63] The jury's verdict, on each charged offense, indicates the jury did not find defendant's testimony to be credible. Defendant's prior conviction for unlawful delivery of a controlled substance, cocaine, not only weakened defendant's credibility but was probative on the issue of defendant's possession [**27] and intent to exercise control over the cocaine, for purposes of future sales and the delivery of the cocaine to others. See *People v. Watkins, 2015 IL App (3d) 120882, ¶ 46, 389 Ill. Dec. 163, 25 N.E.3d 1189* (noting the admissibility of a defendant's prior drug transactions to establish intent to deliver the drug for which defendant is currently charged).

[*P64] In contrast, the jury's verdict indicates the jury found Lafferty's testimony to be credible. It is well established that the credible testimony of a single witness is sufficient to convict even when contradicted by defendant, as in the case at bar. See *People v. Gray, 2017 IL 120958, ¶ 36, 418 Ill. Dec. 916, 91 N.E.3d 876*. We note that portions of Lafferty's testimony were independently corroborated by other evidence. For example, Lafferty testified that her motive for asking the police to remove the gun from the safe was based on her fear that defendant would return to her residence and harm her with the weapon he asked her to keep safe.

[*P65] Further, Lafferty's testimony stated that defendant did not reside with her, but he often appeared at her residence unannounced. This fact was corroborated by law enforcement, when unexpectedly the officers arrived at Lafferty's residence and found defendant waiting in Lafferty's driveway on January 8, 2018. Moreover, Lafferty's testimony explaining [**28] that she gave defendant a key to the safe was corroborated by law enforcement's discovery of the key to the safe on defendant's person on January 8, 2018.

[*P66] Additionally, Lafferty informed law enforcement that defendant brought the gun and other personal property into Lafferty's home on January 4, 2018, and left his other belongings there in addition to the gun. Photographs, taken by law enforcement on January 8, 2018, documented men's clothing piled up in Lafferty's bedroom.

[*P67] Finally, Lafferty testified that defendant had been violent toward her in the past. Officer Martin testified that he observed Lafferty had visible physical injuries on January 8, 2018. These visible injuries, corroborated, in part, Lafferty's testimony about the severity of the beating she received from defendant on January 7, 2018. Further, it is undisputed that defendant was charged and later convicted of battering his daughter on January 7, 2018.

[*P68] Based on this record, we conclude the jury's determination that Lafferty's testimony was credible and defendant's testimony was not, is well supported by the record on appeal. Based on our *de novo* review, we conclude that absent defendant's confession, there was more [**29] than sufficient evidence to support the jury's verdicts.

[*P69] Therefore, we conclude that the outcome of defendant's jury trial would not have been different without the introduction of defendant's incriminating statements.

[*P70] III. CONCLUSION

[*P71] The judgment of the circuit court of La Salle County is affirmed.

[*P72] Affirmed.

**Concur by:** SCHMIDT (In Part)

**Dissent by:** SCHMIDT (In Part)

## Dissent

[*P73] JUSTICE SCHMIDT, concurring in part and dissenting in part:

[*P74] The majority correctly concludes that defendant unequivocally invoked his right to counsel and thus, the circuit court erred in admitting statements defendant made thereafter. However, the majority goes on to usurp the jury's function in determining the credibility of witnesses and weighing conflicting testimony. They then utilize such determinations to wrongly conclude the error is harmless. As set forth below, the evidence of guilt was not so

ocument Delivery Case: 1:22-cv-05080 Document #: 1 Filed: 09/19/22 Page 16 of 19 PageID #:16 Page 10 of

2021 IL App (3d) 190372-U, *190372-U; 2021 Ill. App. Unpub. LEXIS 1755, **29

overwhelming that this court can conclude that no rational jury would have acquitted defendant absent the improperly admitted statements. See *Rivera, 227 Ill. 2d at 22*.

[*P75] As the supreme court has stated, the "recognition of the jury's function to make inferences, weigh conflicting testimony, and determine witness credibility has been noted too often to require the citation [**30] of authority." *People v. Lindgren, 79 Ill. 2d 129, 142-43, 402 N.E.2d 238, 37 Ill. Dec. 348 (1980)*. Further, "the jury's function as a fact finder has been jealously guarded." *Id. at 142*.

[*P76] Without the improperly admitted statements by defendant that the gun and cocaine were his, the jury could have found defendant's trial testimony more credible. Specifically, defendant denied the gun and cocaine were his and testified that he did not know who they belonged to. Defendant admitted he was in possession of a key to the safe but explained it was already on the keychain with the 2010 Lincoln key fob when Lafferty gave him the keys. He testified that Lafferty owned the Lincoln but allowed him to drive it, and Lafferty admitted the car was titled in her name. While Lafferty asserted that she never drove the car and titled it in her name at defendant's request, it was the jury's function to decide who was more credible and to do so untainted by the improperly admitted statements.

[*P77] Although, the majority emphasizes defendant's presence in Lafferty's driveway at the time they returned to search the home as a fact corroborating Lafferty's testimony that defendant often showed up unannounced, it actually corroborates defendant's testimony that he "didn't go in to that house without [Lafferty's] [**31] permission period." Specifically, he was waiting outside the house in a car in the driveway rather than entering the home while Lafferty was not present. Further, while the majority points out that defendant's prior conviction undermines his credibility, the majority ignores Lafferty's potential motive to lie in order to send defendant to prison in retaliation for defendant "slapp[ing] the hell out of" her.

[*P78] Additionally, viewing the evidence without defendant's admissions that the cocaine and gun were his, a rational juror could find that the gun and/or cocaine were not defendant's given Lafferty's connection to the same. Specifically, the undisputed evidence showed that the gun and cocaine were in Lafferty's safe, in Lafferty's bedroom, in Lafferty's home. Defendant did not have a key to her home. And while defendant had a key to the safe, so did Lafferty, and, in fact, Lafferty used her key to unlock the safe for the officers. Additionally, Lafferty admittedly wrote and signed a letter indicating that the gun and cocaine were not defendant's. While the letter's explanation regarding the cocaine is difficult to believe, the letter shows the inconsistent versions given by Lafferty [**32] and would weigh against her credibility. Taking away the improperly admitted statements by defendant leaves one version of facts presented by defendant and two conflicting versions attributed to Lafferty. The foregoing illustrates why the error in improperly admitting defendant's statements undermines any confidence in the jury verdict and hence, why such error was not harmless. See *Johnson, 218 Ill. 2d at 142*.

[*P79] While an uncontaminated jury may have still concluded that Lafferty was a credible witness, this court should not make that determination nor should this court resolve the factual ambiguities against defendant. See *id. at 142-43*. This case was a credibility contest and the improperly admitted statements easily could have influenced the jury's credibility determination. As it is the jury's function to assess credibility, this matter should be remanded for a new trial, uncontaminated by the improperly admitted statements.

End of Document



# SUPREME COURT OF ILLINOIS

SUPREME COURT BUILDING
200 East Capitol Avenue
SPRINGFIELD, ILLINOIS 62701-1721
(217) 782-2035

FIRST DISTRICT OFFICE
160 North LaSalle Street, 20th Floor
Chicago, IL 60601-3103
(312) 793-1332
TDD: (312) 793-6185

January 26, 2022

In re: People State of Illinois, respondent, v. Cordell L. Irons, petitioner.
Leave to appeal, Appellate Court, Third District.
127832

The Supreme Court today DENIED the Petition for Leave to Appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court on 03/02/2022.

Very truly yours,

*Cynthia A. Grant*

Clerk of the Supreme Court

APPENDIX B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

CORDELL L. IRONS
    Petitioner,

Case No. _____

vs.

RACHEL DODD
    Respondent.

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2022, I placed the foregoing PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY and COVER LETTER TO THE CLERK and FILING FEE ($5.00) with the Clerk of this Honorable Court by placing it in the outgoing mail at Robinson Correctional Center for delivery via USPS with proper postage affixed and properly addressed to:

    Clerk of the Court
    United States District Court
    Northern District of Illinois
    219 S. Dearborn Street • 20th Floor
    Chicago, IL 60604

I declare under penalty of perjury that the statements set forth herein are true and correct.

Signed and sworn to before me this 8 day of September, 2022.

/s/ _Cordell Irons_
Cordell L. Irons
IDOC# R18952
Robinson Cor. Cntr.
13423 East 1150th Ave.
Robinson, IL 62454

Respectfully submitted,

NOTARY PUBLIC
NICHOLE DUNLAP
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires Sep 04, 2024

**LEGAL MAIL**

IDOC# R18952
Robinson Correctional Center
13423 East 1150th Avenue
Robinson, IL 62454

22cv5080
Judge Durkin
Judge Valdez
PC 14
RANDOM

Clerk of the Court
United States District Court
**Northern District of Illinois**
219 S. Dearborn Street • 20th Floor
Chicago, IL 60604

09/19/2022-10

23jB

THIS CORRESPONDENCE IS FROM
AN INMATE IN THE ILLINOIS DEPT
OF CORRECTIONS



ZIP 62454
02 4W
0000369180 SEP 14 2022
US POSTAGE $002.16