UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CORDELL L. IRONS, | |
| Petitioner, | No. 22 C 5080 |
| v. | Judge Thomas M. Durkin |
| RACHEL DODD, | |
| Respondent. | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Cordell L. Irons, a prisoner at Jacksonville Correctional Center, brings this *pro se* habeas corpus action under 28 U.S.C. § 2254 challenging his 2019 convictions for unlawful possession of a controlled substance with intent to deliver and unlawful possession of a weapon by a felon in the Circuit Court of La Salle County, Illinois. For the reasons below, the Court grants the petition for a writ of habeas corpus.

**Background**

The background facts are taken primarily from the Illinois Appellate Court's opinion in Irons' direct appeal, *People v. Irons*, 2021 IL App (3d) 190372-U ("*Irons*"). "We take the facts from the Illinois Appellate Court's opinion[] because they are presumptively correct on habeas review and [Irons] has not rebutted this presumption." *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1)). The Court supplements these facts with additional facts from the trial court record where necessary.

1

A. Conduct

On January 8, 2018, Samantha Lafferty reported to police that Irons committed domestic battery against her and their daughter the day before and that she was concerned about a gun in her home that belonged to Irons, a convicted felon. *Id.* ¶ 5. Lafferty consented to a search of her residence. *Id.* When police arrived at the residence, they found Irons sitting in a 2010 Lincoln parked in the driveway and arrested him for domestic battery. *Id.* ¶ 6. Police then entered the home, and Lafferty opened a safe in her bedroom for them with her key. *Id.* ¶ 7. Inside that safe, police found a gun and approximately 31 grams of a substance containing cocaine. *Id.*

B. Police Interview

Thereafter, police interviewed Irons at the police station. *Id.* ¶ 8. Officer Nicholas Martin read Irons the *Miranda* warnings and spoke to him about the alleged domestic violence incident. *Id.* ¶ 9. After 20 to 25 minutes, La Salle Police Officer/Tri-Dent Drug Task Force Agent Brian Zebron and La Salle Police Detective Curt Martin took over questioning and began asking Irons about the gun and cocaine discovered in the safe. *Id.* ¶ 9.

The recording of the interview includes the following statements by Irons: "I'm not [answering or asking] no questions, my lawyer ain't here. Why would I answer questions? I'm not asking questions. I'm not here to ask the questions. I'm just here to tell you what's not mine." *Id.* ¶ 18. The recording shows Det. Martin telling Irons it was "fine" if he wanted a lawyer, and Irons continuing, "It's not mine man. Now

how you supposed to help me out? How am I getting helped?" *Id.* ¶¶ 10, 19. Zebron responded by telling Irons that he could help himself by cooperating. *Id.* ¶ 19.

Shortly thereafter, La Salle Police Lieutenant Michael Smudzinski escorted Irons to a holding cell. *Irons* ¶¶ 10, 11, 59. Smudzinski continued speaking to Irons for a little less than three minutes in the holding cell. *Id.* ¶ 12. After this short conversation, Smudzinski let him out of the holding cell and brought him back to the interview area. When Zebron returned to the interview area near the holding cell Zebron, Irons stated, "What's up Zebron?" *Id.* Zebron replied "I don't know what's up. But here's the deal, you wanted a lawyer." *Id.* Irons responded "Nah, I never asked for no lawyer. I said my lawyer's not present to be asking no questions like that. I'm not going to ask no questions." *Id.* Thereafter, Zebron resumed questioning Irons about the gun and the drugs discovered in the safe. *Id.*

Over the next several hours, Irons made incriminating statements to Zebron related to his cocaine sales and explained how he obtained the gun that police had seized. *Id.* ¶ 13. Irons' statements included that: he had been in the safe before; he had touched the gun and the cocaine such that his fingerprints would be on those items; he got the gun to protect himself but had not used it before; he had purchased the gun from a "white kid" the prior summer for $250; he got the cocaine from someone who came to the area; he was "fronted" the cocaine, and he sold a "couple [of] eight balls" a week. *See* R. 19-9 at 12:59:17–01:14:20; 01:51:27–01:52:31.[1]

---

[1] The Court details Irons' statements based on its review of the video recording of the interview submitted by Respondent as the statements were not described in the appellate court's opinion. *See* R. 19-9.

3

C. Motion to Suppress

Irons was charged with unlawful possession of a controlled substance with intent to deliver and unlawful possession of a weapon by a felon. *Irons* ¶ 14. Before trial, Irons filed a motion to suppress the incriminating statements, arguing that police improperly continued to question him after he verbalized his desire to end the conversation with Zebron because his lawyer was not present. *Id.* ¶ 15. During the hearing, the State introduced the relevant portions of the video and audio recordings of the interview and testimony from Zebron, Det. Martin, and Smudzinski. *Id.* ¶¶ 16–21. At the conclusion of the hearing, the trial court ruled that Irons did not clearly and unequivocally assert his right to counsel and denied the motion to suppress. *Id.* ¶ 22.

D. Trial

At trial, the State first called Lafferty as a witness. *Id.* ¶ 24. Lafferty testified that she had known Irons for 20 years and that she was the mother of two of his daughters. *Id.* ¶ 25. Irons did not live at the residence where Lafferty lived with their daughters, but the door to the residence could not be locked and Irons often entered, after knocking before entry, to visit the children. *Id.* ¶ 25. According to Lafferty, on January 4, 2018, Irons brought a gun into the home and instructed her to "put it up." *Id.* ¶ 27. She removed her own belongings from a small safe she had, put the gun inside, locked the safe, and gave Irons one of the two keys to the safe. *Id.* Irons also left his clothing, shoes, and coats in the home and told her he was leaving them there for a few days. *Id.* ¶ 26. Irons did not stay at Lafferty's home between January 4 and

4

January 8, 2018, and a photograph introduced into evidence showed Irons' clothing in piles in Lafferty's bedroom. *Id.*

Lafferty testified that on January 7, 2018, Irons was eating a meal with Lafferty and their daughter, when he scolded their daughter for using poor manners. *Id.* ¶ 27. When his daughter left the table, Irons "stood up, and grabbed [her] by her throat and put her up in the air." *Id.* After Lafferty intervened, Irons hit both Lafferty and their daughter. *Id.* Following the incident, Lafferty became worried about Irons' ability to access the gun, and the next day, as detailed above, she went to the station and told the police about the gun. *Id.* ¶ 28. She told police that the items in the safe were brought there by Irons and were not hers. *Id.*

On cross-examination, defense counsel presented a letter Lafferty wrote on April 4, 2018, in which she stated that her January statement to police was not true. *Id.* ¶¶ 29–30. The letter said that another man she was seeing left the gun at her home, and that she kept the gun locked in her safe. *Id.* ¶ 30. The letter continued that she found the drugs outside behind her garage and put them in her safe. *Id.* Lafferty also wrote that she told police the items in the safe belonged to Irons because she was angry at him after the incident with their daughter. *Id.*

At trial, Lafferty testified that the statements in the letter were untrue. *Id.* ¶ 32. She testified that she never possessed the gun, neither found nor placed the drugs in the safe, and she had not been in another relationship since 2008. *Id.* Lafferty said that Irons showed up at her home without warning and instructed her to write the letter. *Id.* ¶¶ 29, 31. She stated that she complied because of his history of abuse; in

5

her experience, if Lafferty did not do what Irons asked, she would be physically or verbally abused. *Id.* ¶¶ 29, 33. Lafferty testified that the 2010 Lincoln was Irons' car, that she did not have a key or access to it, and that she titled it in her name at his request. *Id.* She also said that in the 20 years she had known Irons, he was generally not employed, and she only knew of one job he had for about two months in the summer of 2018. *Id.* ¶ 34.

The State also called as witnesses Ofc. Martin, Det. Martin, Smudzinski, Zebron, and three employees from the Illinois State Police ("ISP") forensic science laboratory. Ofc. Martin stated that Lafferty appeared at the station with visible injuries and expressed concern about the gun she had been given. *Id.* ¶ 36. He and Det. Martin testified that they and other officers went with Lafferty to her residence and searched the safe which Lafferty opened using a key, where they found a .380-caliber handgun, 31.6 grams of cocaine, and a digital scale. *Id.* ¶¶ 36, 38, 39, 42, 45. Det. Martin further testified that Lafferty pointed out baggies and scissors in a dresser drawer in her bedroom. *Id.* ¶ 39. Smudzinski testified that Irons was carrying about $1,900 in cash and a set of keys, including a car key and a key to the safe, when he was arrested. *Id.* ¶ 40. Smudzinski also stated that in July 2018 he found Lafferty's letter in the 2010 Lincoln, which was impounded in the execution of a search warrant and was at that time registered to another person. R. 19-7 at 71:20–72:21.

Zebron was qualified as an expert in the field of narcotics investigations and testified about Irons' statements during the interview and the gun and the drugs recovered in the safe. During his testimony, the State played a video of a portion of

the interview. *Irons* ¶ 41. Zebron testified that during the interview, Irons admitted that he sold cocaine, that he had touched the bag of cocaine and the gun on other occasions such that his fingerprints would be on them, and that he purchased the gun for $250. *Id.*; R. 19-7 at 90–93. Zebron further testified that the significant amount of cocaine found along with the scale, baggies, and scissors indicated the cocaine was for distribution. *Irons* ¶ 42. All of the officers testified that initially, Irons denied any involvement with the gun or cocaine found in the safe. R. 19-7 at 45:18–21, 63:9–11, 76:14–17, 101:17–20. The employees from the ISP forensic science laboratory also testified as to the chain of custody. *Irons* ¶¶ 43–45. Additionally, law enforcement witnesses stated that the police never analyzed any of the items found for fingerprints or DNA. R. 19-7 at 62:6–63:5; 74:23–74:5; 130:11–19. Lastly, the State introduced a certified copy of Irons' prior felony conviction for unlawful delivery of a controlled substance, cocaine. *Irons* ¶ 45.

    Irons testified on his own behalf. He stated that he had been to Lafferty's home several times but did not live there, did not have a key, and was not aware that the front door did not lock. *Id.* ¶ 47. He testified that when police arrived, he was parked in the driveway waiting to talk to his daughter about the incident the night before, and admitted that he pled guilty to domestic battery. *Id.* Irons said that Lafferty owned the 2010 Lincoln, allowed him to use it, and gave him the keys. *Id.* ¶ 48. When asked about the smaller key he was carrying when arrested, he testified that it was on the key ring when Lafferty gave it to him and that he never used the small key but assumed it went to Lafferty's safe. *Id.* ¶ 49. Irons also stated that he was working

7

with a friend reselling old pallets in January 2018 and had been for about 15 months but could not recall his friend's last name. *Id.* ¶ 50. He said he got the approximately $1900 found in his pocket when he was arrested from that work, and felt safest keeping the money on him because he was living with his uncle and saving money for an apartment. *Id.* ¶ 51.

Irons explained that he initially denied any knowledge of the gun or cocaine, but he was scared and thought that if he told police what they wanted to hear, they would work with him. *Id.* ¶ 52. He eventually told police he had been in the safe numerous times and that he bought the gun. *Id.* At trial, he testified that he never went in the safe, the gun and cocaine were not his, he did not know who they belonged to, and that he did not place baggies or scissors in Lafferty's dresser drawer. *Id.* Irons also acknowledged that he was present when Lafferty wrote the letter, but did not force her to do so or make any threats. *Id.* ¶ 53. According to Irons, Lafferty told him she "felt bad about everything" and gave police her initial statement because she wanted him to "do more time." *Id.*

The State's closing argument relied heavily on the statements that Irons sought to suppress. *Id.* ¶ 54. The jury ultimately found Irons guilty of unlawful possession of a controlled substance with intent to deliver and unlawful possession of a weapon by a felon. *Id.* ¶¶ 2, 54. On May 24, 2019, he was sentenced to 22 years imprisonment for the first count and a concurrent term of 10 years on the second count. R. 19-2 at 14.

8

E. Direct Appeal

Irons appealed, claiming that the trial court should have suppressed his statements to police because he unequivocally invoked his right to counsel during the interview. *Irons* ¶ 56. The appellate court found that the trial court erred in admitting Irons' statements but that the error was harmless. *Id.* ¶¶ 59, 62, 68–69. Illinois Appellate Court Justice Schmidt concurred that the trial court erred in admitting the statements, but wrote in dissent that the error was not harmless. *Id.* ¶¶ 73–79. Irons renewed his claim in a petition for leave to appeal to the Illinois Supreme Court, which the court denied on January 26, 2022. *See* R. 19-5; R. 19-6.

F. Habeas Corpus Petition

In September 2022, Irons timely filed a habeas corpus petition under 28 U.S.C. § 2254. R. 1. The petition alleges a single "primary" claim that Irons' statements to police after he invoked his right to counsel were improperly admitted at trial and three "supporting" grounds: that the appellate court erroneously found the admission of Irons' statements to be harmless error; the admission of Irons' statements had a substantial and injurious effect on the outcome of the trial; and the appellate court usurped the role of jury as factfinder in holding that the error was harmless. *Id.* at 4–5. The Court understands Irons to be raising two claims: (1) the trial court erred in admitting his statements to police after he invoked his right to counsel, and (2) the appellate court erred in holding that the admission of those statements was harmless error. Because the appellate court already held that the trial court erred by admitting

9

Irons' incriminating statements, the only issue here is whether the appellate court improperly found that the trial court's error was harmless.

## Discussion

Irons contests the appellate court's determination that the trial court's error was harmless. On direct appeal, a trial court error involving a constitutional violation does not warrant reversal if it was harmless beyond a reasonable doubt. *Ayala v. Davis*, 576 U.S. 257, 276 (2015) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). On collateral review, however, where a state court has found an error to be harmless, a petitioner must satisfy both *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See Brown v. Davenport*, 596 U.S. 118, 134 (2022).

The Supreme Court in *Davenport* recently explained how the two tests are analytically distinct. Under *Brecht*'s "actual prejudice" test, a petitioner may prevail by persuading a federal court that it alone should harbor 'grave doubt'—not absolute certainty—about whether the trial error affected the verdict's outcome." *Id.* at 135. In contrast, AEDPA requires a petitioner "to prove that a state court's decision was unreasonable." *Id.* In other words, "where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Id.* at 136 (emphasis in original).

Beginning with *Brecht*, the Court must make a "probabilistic assessment" of whether the admission of Irons' statements to police after invoking his right to counsel had a "substantial and injurious effect or influence" on the outcome of the

10

trial." *Brown v. Eplett*, 48 F.4th 543, 561 (7th Cir. 2022) (quoting *Brecht*, 507 U.S. at 637). This inquiry is different than assessing whether there was enough evidence at trial to support a verdict. *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015) (citing *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946) ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.")). The Court considers "the overall strength of the State's case against the totality of the evidence," which "may necessarily touch upon questions of witness credibility and the plausibility of the respective theories of the case." *Eplett*, 48 F.4th at 561. Under *Brecht*, the petitioner bears the burden of demonstrating that the error had a "substantial and injurious effect or influence." *Id.* at 557.

Here, the Court has grave doubt about whether the admission of Irons' incriminating statements had a "substantial and injurious effect or influence" on the jury's verdict. Irons' statements were the centerpiece of the State's case. The State played the video of Irons making the incriminating statements to the jury. Zebron testified about Irons' statements in the context of his experience with how drug dealers typically operate. And the State heavily relied on his statements in its closing argument.

Outside of these statements, there was a dearth of direct evidence connecting Irons to the items. There was no fingerprint or DNA analysis linking Irons to either the gun or the cocaine, nor were there any witnesses who testified about Irons' purported drug trade activities. Instead, the evidence was largely circumstantial.

11

Irons had a key to the safe where the gun and cocaine were found, and that key was on a key ring with the key to the 2010 Lincoln he drove. He left other belongings, including clothes, shoes, and coats, in Lafferty's bedroom where the safe was. He had approximately $1900 in cash in his pocket when he was arrested. And he had a prior conviction for unlawful delivery of a controlled substance, cocaine.

Further, this circumstantial case was weakened by other evidence connecting Lafferty to the gun and the drugs. Though Irons had a key to the safe, so did Lafferty. Lafferty used that key to unlock the safe for police. And Lafferty admitted to giving Irons a key to the safe, which was on a key ring with a key to the 2010 Lincoln that was titled in her name. The safe was located in Lafferty's bedroom in her residence, and it was undisputed that Irons did not live in that home, did not have a key to the home, and would typically knock before entering. The fact that police found Irons sitting in the car in the driveway of the residence when they arrived further supports that Irons would not enter the residence without Lafferty's permission. Also, in addition to the gun, cocaine, and digital scale found in Lafferty's safe, police found scissors and baggies in Lafferty's dresser. *Cf. Eplett*, 48 F.4th at 561 (explaining that the court had no grave doubt about verdict in light of jury instruction error because petitioner's version of events was not supported by any physical evidence or testimony other than his own).

Alongside this circumstantial evidence was a credibility contest between Irons and Lafferty. Both Irons and Lafferty testified at trial. And while Irons' prior conviction for unlawful delivery of a controlled substance may have undermined his

12

credibility, the letter Lafferty admitted to writing indicating that the gun and drugs did not belong to Irons may have undermined hers. True, the letter's assertion that Lafferty found that amount of cocaine behind her garage is somewhat dubious. And Lafferty's testimony that Irons forced her to write the letter under threat of abuse is corroborated to some extent by her appearance with physical injuries at the police station and Irons's conviction for domestic battery against her. But the letter, at a minimum, shows that Lafferty has changed her story, and that inconsistency could have cut against her credibility. *See Jensen*, 800 F.3d at 906–08 (finding that improperly admitted letter and accusatory statements resulted in actual prejudice where the evidence was all circumstantial, there was evidence supporting the defense's theory of the case, and there were credibility issues with the witness inculpating the defendant).

In all, the cross-cutting evidence connecting both Irons and Lafferty to the gun and the drugs and the credibility issues with both individuals more than likely made Irons' incriminating statements the deciding factor. The incriminating statements were direct evidence showing that Irons possessed the gun and the drugs. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)). And while "an abundance of incriminating evidence can show that one arguably improper admission had no effect on the jury's verdict," that is not the case here. *Cf. Kidd v. Gomez*, 2 F.4th 677, 680

13

(7th Cir. 2021) ("abundant and damning evidence" of defendant's guilt including two voluntary confessions under oath showed that improper admission of coerced statement did not have a substantial and injurious effect on the verdict).

What's more, Irons' incriminating statements served to impeach his testimony at trial. Without the confession, the jury would have only had Irons' testimony at trial that the gun did not belong to him, that he did not know who they belonged to, and that he had never gone in the safe and the consistent statements he initially made to police. Instead, Irons' testimony stood in direct contradiction to a video-taped confession that never should have been shown to the jury. The resulting harm to his credibility on the stand cannot be overstated. Likewise, Irons' incriminating statements served to rehabilitate Lafferty by lending credence to her initial statement to police and trial testimony over her inconsistent statements in the letter. Altogether, there is "much more than a 'reasonable probability'" that the admission of Irons' confession affected the verdict. *See Ayala*, 576 U.S. at 268 (quoting *Brecht*, 507 U.S. at 637).

The next question is whether Irons' petition passes AEDPA's "difficult to meet and highly deferential" test. *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015). AEDPA precludes a federal court from granting a state prisoner's habeas petition unless the state court's merits adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State

14

court proceeding." 28 U.S.C. §§ 2254(d)(1), (2). In this case, Irons does not dispute that the appellate court correctly identified the controlling standard for harmless error review, but rather argues that the court unreasonably applied that standard to the facts of his case.[2]

Turning to the appellate court's ruling, the court began by stating that the verdict reflected that the jury did not find Irons' testimony credible, citing his prior conviction as both diminishing his credibility and showing his possession and intent to exercise control over the drugs at issue. *Irons* ¶ 63. The court then stated that the verdict indicated that the jury found Lafferty's testimony credible, describing how her testimony connecting Irons to the items in the safe was corroborated by other evidence in the record. *Id.* ¶¶ 64–67. The court concluded that because the jury's determinations as to the credibility of Irons and Lafferty were well supported by the record, "there was more than sufficient evidence to support the jury's verdict." *Id.* ¶ 68.

Certainly, overwhelming evidence of guilt can show that an error was harmless beyond a reasonable doubt. But that determination must be made in view of the totality of the evidence, not just the evidence supporting the State's case. And here,

---

[2] Although Irons states in his reply, briefly and in a conclusory fashion, that the appellate court's adjudication also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," he does not provide any argument in support. R. 23 at 19. As such, the Court declines to consider this claim. *Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) ("arguments raised for the first time in a reply brief are deemed waived").

15

noticeably missing from the appellate court's analysis is any discussion of the evidence contrary to the State's theory of the case or Lafferty's own credibility issues, as detailed previously. *See Jensen*, 800 F.3d at 904, 907 (emphasizing how the appellate court did not address the defense evidence or "the significant credibility problems" of the State's witness who testified that the defendant confessed to murdering the victim). No fairminded jurist considering all of the evidence would conclude the error was harmless beyond a reasonable doubt, that is, there wasn't even a "reasonable possibility" the error affected the verdict. *See Chapman*, 386 U.S. at 23. As such, because the appellate court unreasonably applied *Chapman*, Irons has cleared AEDPA's high bar for relief.

## Conclusion

For the foregoing reasons, the Court grants Irons' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The State has 90 days, or until March 14, 2024, in which to decide whether to retry Irons; if the State decides not to retry Irons or makes no decision within that period, Respondent must release Irons from prison. In the event Respondent elects to appeal, the judgment will be stayed pending disposition of the appeal.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: December 15, 2023

16